## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANNIE BELL ADAMS, DENNIS PAUL FOBES, LEIGH E. FOBES, MARGARET LAMBERT, and BETTY L. GUNTER, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | |
| -versus- | ) ) | |
| | ) | JURY TRIAL REQUESTED |
| BANK OF AMERICA CORP., BANK OF AMERICA, N.A., BARCLAYS BANK PLC, CITIGROUP, INC., CITIBANK N.A. COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CREDIT SUISSE GROUP, AG, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC JPMORGAN CHASE & CO., CHASE BANK USA, N.A., LLOYDS BANKING GROUP PLC, ROYAL BANK OF CANADA, ROYAL BANK OF SCOTLAND and UBS AG, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

NOW COME the Plaintiffs, Annie Bell Adams, Dennis Paul Fobes, Leigh E. Fobes, Margaret Lambert and Betty L. Gunter, on behalf of themselves and all others similarly situated, by and through their counsel, and file this Complaint alleging violations of federal antitrust, racketeering, breach of contract and other claims against the Defendants identified below (collectively "Defendants") arising from their collusive manipulation and fixing of the London

InterBank Offered Rate ("LIBOR") from on or before January 2000 through at least February 2009 (the "Class Period").

## INTRODUCTION

1.     The Plaintiffs' claims arise from violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).  This action seeks injunctive and equitable relief under section 16 of the Clayton Act prohibiting the Defendants from creating, operating, maintaining, aiding, abetting or participating in any trust, combine or monopoly, the effect of which is to damage Plaintiffs and Class members, though price-fixing or otherwise, for a class of persons in all fifty (50) United States, including, if available, disgorgement of all ill-gotten gain, and restitution.

2.     Additionally, Plaintiffs claim damages from Defendants for violation of the Racketeer Influence Corrupt Organization Act ("RICO") for conspiring to manipulate and make artificial the London InterBank Offered Rate ("LIBOR") from January 2000 to on or about February 2009 (the "Relevant Period") for a class of persons in all fifty (50) United States.  The Plaintiffs seek damages for remedies authorized by federal statute, including but not limited to treble damages, exemplary damages, compensatory damages and the recovery of legal fees, related court costs and any additional fees that the court sees fit to be paid for and furnished as a result of the unlawful, fraudulent and tortuous conduct of Defendants, and to restrain Defendants and their co-conspirators from engaging in the activities, fraud and other unlawful conduct in the future, and to compel Defendants to disgorge the proceeds of their unlawful conduct.

3.     A claim is made for violation of the New York state antitrust statute, the "Donnelly Act," on behalf of all persons, wherever situate, because the conspiracy to restrain and

the business, trade and commerce was centered, based and almost entirely perpetrated from within the state of New York.

4.     The Court has supplemental jurisdiction of the state law claims addressed herein, as they arise out of a common nucleus of operative fact.

5.     These claims arise from loan transactions in which the Plaintiffs are borrowers and upon which loans the interest rates were indexed to LIBOR.  Principally, the relevant transactions are transactions in which the Plaintiffs entered into real estate loans resulting in mortgages on Plaintiffs' principal residences.

6.     The Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to the Plaintiffs and their counsel, which are made on personal knowledge) as to all matters, based upon, inter alia, the investigation conducted by its attorneys, which included: a review of Defendants' public documents; review of regulatory materials; review of scholarly research; review of wire and press releases; an other obtainable information

7.     Except as alleged herein, neither the Plaintiffs nor other members of the public have access to all the facts underlying and relating to Defendants' improper activities.  Rather, the information lies exclusively within the possession and control of Defendants and other insiders, which prevents the Plaintiffs from further detailing Defendants' misconduct.  Moreover, numerous pending government investigations – both domestically and abroad, including by the United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and the SEC – concerning potential LIBOR manipulation could yield information from Defendants' internal records or personnel that bears significantly upon the Plaintiffs' claims.

The Plaintiffs thus believe additional evidence in support of these allegations will come to light through discovery.

## JURISDICTION AND VENUE

8.      This action arises under Sections 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes the Plaintiffs, who are damaged by any violation of the antitrust law of the United States to bring suit in any court of the United States having jurisdiction over the parties for injunctive and equitable relief.

9.      This action is also brought pursuant to the provisions of Chapter 96 of Title 18, United States code, codified at 18 U.S.C. §§ 1961-1968, entitled Racketeer Influenced and Corrupt Organizations ("RICO").   RICO authorizes the plaintiffs to seek declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this Court deems just and proper.

10.      The Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the class exceeds $5 million exclusive of interest and costs.

11.      The Court has supplemental jurisdiction of the state law claims prosecuted herein, as they arise out of a common nucleus of operative fact.

12.      Venue is proper in the District pursuant to Sections 16 of the Clayton Act, 15 U.S.C. § 26 and 28 U.S.C. § 1391(b), (c) and (d).   One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiffs' claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

13.     Each Defendant is amenable to the *in personam* jurisdiction of this Court by service of process pursuant to 15 U.S.C. § 22.

## THE PARTIES

### Plaintiffs

14.     Plaintiff Annie Bell Adams is an individual who resided in a home which located at 2230 Hoppin Street, Mobile, Alabama.

15.     Plaintiffs Dennis Paul Fobes and Leigh E. Fobes, are individuals who reside in a home located at 3308 Riverside Drive, Mobile, Alabama.

16.     Plaintiff Betty L. Gunter is an individual who resides in a home, which she owns, located at 12971 Del Rio Street, Grand Bay, Alabama.

17.     Plaintiff Margaret Lambert is an individual who resides in a home, which she owns, located at 1909 Government Street, Mobile, Alabama.

### Defendants

18.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A.--a federally-chartered national banking association headquartered in Charlotte, North Carolina—is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation.  Defendants Bank of America Corporation and Bank of America, N.A., shall hereinafter be collectively referred to as "Bank of America."

19.     Defendant Barclays Bank PLC ("Barclays") is a British public limited company headquartered in London, England, United Kingdom.

20.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.   Defendant Citibank, N.A.—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

21.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

22.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

23.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

24.     Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank PLC—a United Kingdom public limited company headquartered in London, England—is a wholly-owned subsidiary of Defendant HSBC Holdings PLC.  Defendants HSBC Holdings PLC and HSBC Bank PLC are referenced collectively in this Complaint as "HSBC."

25.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National Association—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendant Chase Bank USA, National Association—a Delaware federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N. A. and Chase Bank USA, N. A. are referenced collectively in this Complaint as "JPMorgan Chase."

26.     Defendant Lloyds Banking Group PLC ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Defendant Lloyds was formed in 2009 through the acquisition of Defendant HBOS PLC ("HBOS")—a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland—by Lloyds TSB Bank PLC.

27.     Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

28.     Defendant The Royal Bank of Scotland Group PLC ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

29.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

30.     Defendants Bank of America, BTMU, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, RBC,  RBS, UBS, and WestLB (collectively, "Defendants") were members of the British Bankers' Association's (hereinafter referred to as "BBA") USD-LIBOR panel during the Relevant Period.

## UNAMED CO-CONSPIRATORS

31.      Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## DEFINITIONS

32.     ABX Indices:  A published index used in the valuation of sub-prime mortgage backed securities.  Also known as the Asset Backed Securities Index.

33.     Asset Backed Securities ("ABS"):  Securities that represent an interest in an underlying pool of referenced assets.  The referenced pool can comprise any assets which attract a set of associated cash flows but are most commonly pools of residential or commercial mortgages.  See also Collateralized Debt Obligations ("CDOs").

34.     Collateralized Debt Obligation ("CDO"):  CDOs are securities issued by an issuer which reference asset backed securities ("ABS") and possibly other assets owned by the issuer.   Many CDOs feature exposure to sub-prime mortgage assets.

35.     Collateralized Loan Obligation ("CLO"):  A CLO is a security backed by the repayments from a pool of loans.  The payments may be made to different classes of owners (in tranches).

36.     Credit Default Swaps:  Credit Default Swaps are contracts under which the protection seller receives premiums or interest-related payments in return for contracting to make payments to the protection buyer in the event of a defined credit event. Credit events ordinarily include bankruptcy, and payment default.

37.     Derivative Instruments include but are not limited to asset swaps, collateralized debt obligations, credit default swaps, forward rate agreements, inflations swaps, interest rate swaps, total return swaps, and options.  Asset Swaps are a type of over-the-counter derivative in which one investor exchanges the cash flows of an asset or pool of assets for a different cash flow.

38.     Euro Interbank Offered Rate ("EURIBAR"):  A benchmark interest rate at which banks can borrow funds from other banks in the European interbank market.

39.     Mortgage Backed Securities ("MBS"):  Securities that represent interests in a pool of mortgages.  Investors in these securities have the right to receive cash from future mortgage payments of principal and/or interest.

40.     Securitization:  Securitization is, typically, a process by which debt instruments such as mortgage loans or credit card balances are aggregated into a pool, which is used to back new securities. A company sells assets to a special purpose vehicle which then issues securities backed by the assets. This allows the credit quality of the assets to be separated from the credit rating of the original borrower and transfers risk to external investors.

41.     Sub-prime Loans:  Subprime loans are typically loans to persons with weak credit histories with heightened risk of default.

42.     Trading Book:  A regulatory classification consisting of all positions in financial instruments or commodities which a bank holds or is deemed to hold.

## PLAINTIFFS' TRANSACTIONS

43.     The Plaintiffs' and class members' mortgage loan transactions described below are "federally related mortgage" loan transactions pursuant to 12 U.S.C. §§ 2602(1).

44.     On October 23, 2002, Annie Bell Adams entered into a real estate mortgage transaction with Ameriquest.  Ameriquest placed the mortgage into a pool and sold the pool to Defendant Deutsche Bank.  On information and belief, Deutsche Bank then transferred the pool assets to Deutsche Bank National Trust Company.  Her mortgage is part of Deutsche Bank National Trust Company's Trust 2003-X2, Asset-Backed Certificates, Series 2003-X2.   The

promissory note in this transaction is a "LIBOR-plus" note with the interest rate indexed to Six Month USD-LIBOR.

45. On or about April 26, 2006, Dennis and Leigh Fobes entered into a real estate mortgage transaction, refinancing the home in which they had lived since March of 2005, with Long Beach Mortgage Company (the subprime lending unit for Washington Mutual Inc.). On information and belief, the mortgage was placed in a pool and securitized as Long Beach Mortgage Loan Trust 2006-5. Long Beach Mortgage Loan Trust 2006-5 is a trust administered by Deutsche Bank National Trust Company.

46. On December 20, 2006, Mrs. Gunter entered into a real estate mortgage transaction with Chase Bank USA in the amount of $78,400.00. On information and belief, Gunter's mortgage stands as an asset to a CDO issued and owned (in part) by JP Morgan Chase.

47. On April 12, 2005, Mrs. Lambert entered into a real estate mortgage transaction with the Mortgage Electronic Registration Systems, Inc. in the amount of $152,000.00. The promissory note in the Lambert transaction provided that on May 1, 2007, (the Change Date) and on that day every six months thereafter, her interest rate would adjust to Six Month USD-LIBOR plus 5.370%. On information and belief, the Lambert Mortgage was transferred to UBS and pooled with other mortgages in a SPE and collateralized into a ABS, owned and traded by UBS.

48. The Plaintiffs' residential mortgages were obtained in consumer credit transactions and were primarily for personal, family or household purposes and the mortgages were all secured by the Plaintiffs' and the class members' respective dwellings.

49. The Defendants, in each instance above, took each Plaintiffs' mortgage and placed it into a carefully structured pool and transferred the mortgages to Special Purpose Entities

("SPEs") which collateralized the mortgages into Mortgage Backed Securities.  The SPEs then issued LIBOR-Based Collateralized Debt Obligations for which the Plaintiffs' mortgages were underlying assets.

50.     The Defendants then marketed, sold, and traded the LIBOR-Based CDOs to investors.  The Defendants, each of them, maintained ownership of some of the LIBOR-Based CDOs for which the Plaintiffs' mortgages stand as security.

## NATURE OF THE ACTION

51.     This matter arises from a global conspiracy to fix or set LIBOR – the reference point for setting interest rates on adjustable rate mortgages and other loans – by a cabal of prominent financial institutions.

52.     Since its inception in approximately 1986, the London Interbank Offered Rate ("LIBOR") has been the benchmark interest rate used in financial markets around the world. Mortgage rates, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rates.  Additionally, futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are settled based upon LIBOR.

53.     LIBOR is published under the authority of the British Bankers' Association ("BBA"), a trade association with over 200 member banks that addresses issues involving the United Kingdom banking and financial services industries.  The BBA defines LIBOR thusly:

> The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11 [a.m.] London time.

54.     The BBA describes LIBOR as "the primary benchmark for short term interest rates globally."  Consistent with the BBA's description, USD LIBOR is the "primary benchmark" for short term interest rates in the United States, and in particular is widely used as the index ("The Index") for most, if not all, adjustable rate mortgages ("ARMs").  As an analyst for a division of Defendant Citigroup explained:

> LIBOR is by far the most popular floating-rate index in the world.  Its importance has evolved far beyond its humble roots as an interbank lending rate. LIBOR touches everyone from the largest international conglomerate **to the smallest borrower in Peoria**:  It takes center stage in every interest rate swap (whether it is explicitly part of the cash flow or not) and the great majority of floating-rate securities and loans.  As such, the functionality and relevance of LIBOR is of primary importance to the global financial system. (emphasis added)

55.     LIBOR is calculated for ten currencies.  The LIBOR for a given currency is the result of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA.  Each member of the Contributor Panel submits its rates every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London time.  Once each Contributor Panel Bank has submitted its rate; the contributed rates are ranked.  The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity ("tenor") for that date.

56.     The LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" is one-hundredth of one percent (0.01%).

57.     Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time (6:30 a.m. New York).  Fifteen maturities (or tenors) are quoted for each currency, ranging from overnight to twelve months.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of interstate communications sources.

58.     Each Contributor Panel bank must submit its rate each day without reference to rates contributed by other Contributor Panel banks.  The basis for a Contributor Panel bank's submission according to the BBA, must be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than a bank's derivative trading book, assess the banks costs to borrow unsecured interbank funds in the London money market.  Further, according to BBA, a Contributor Panel bank may not contribute a rate based on the pricing or fixing of any derivative financial instrument.  In other words, a Contributor Panel banks LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivative transactions tied to LIBOR.

59.     The Contributor Panel for United States Dollar LIBOR has at all relevant times been comprised of between sixteen (16) and eighteen (18) banks, including JP Morgan Chase & Co (parent of Chase Bank, U.S.A., N.A.), Deutsche Bank AG, and Barclays.

60.     The Defendants Bank of America, Barclays, Citigroup, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds Banking, Royal Bank of Canada, Royal Bank of Scotland, and UBS were at all relevant times, the largest underwriters of Collateralized Debt Obligations in the world.

61.     Defendants, the banks that comprised the U. S. dollar LIBOR panel during the Class Period (as defined below), were motivated to manipulate and increase LIBOR on or about the first day of each month because they knew that most adjustable rate mortgages and promissory notes contained a clause establishing the first day of the month as a "Change Date" and that the new rates would be set on that day.

62.     Seasonably manipulating LIBOR so as to increase it (or keep it from decreasing as much as it should have) allowed Defendants to raise the interest rates paid by the Plaintiffs on their adjustable rate notes and thereby increasing the spread between the amount they paid investors and the amount they collected from debtors like the Plaintiffs.

63.     Throughout the Class Period, Defendants' employees conspired to, and in fact did, manipulate LIBOR on a daily basis by requesting the actual interest rates be higher, lower, or unchanged for particular tenors and currencies.

64.     Throughout the Class Period, the LIBOR 6 month rates on the first business day of each month are, on average, more than two basis points higher than the average LIBOR 6 month rates throughout the Class Period.  Additionally, from August, 2007 through February, 2009, the LIBOR 6 month rates on the first business day of each month are, on average, more than seven and one-half basis points higher than the average LIBOR 6 month rates.  Finally, the LIBOR 6 month rates on the first business day of each month are, the great majority of the time, higher than the five-day running average of the LIBOR 6 month rate surrounding the first business day submissions throughout the Class Period.

65.     Defendants, who are each Contributor Panel banks (or holding companies of Contributor Panel banks) for the USD LIBOR, knew or understood that it was common practice

during the Class Period for adjustable rate mortgages to be indexed to the six (6) month dollar denominated LIBOR rate for the first business day of each month.  Indeed, the Defendants themselves bundled the Plaintiffs mortgages into Asset Backed Securities including Collateralized Debt Obligations and issued and traded in derivative instruments related to the ABSs and CDOs some of which were held in their own portfolios.  Accordingly, it was not only foreseeable but obvious that by manipulating the USD LIBOR rate, to which the Plaintiffs mortgages were indexed, on or about the Change Dates of the adjustable rate mortgages, the Defendants were able to maximize the value of their holdings and thereby unjustly enrich themselves to the detriment of the Plaintiffs and the Class.

66. Investigations regarding LIBOR are ongoing in the United States, Switzerland, Japan, United Kingdom, Canada and the European Union, and Singapore by ten different governmental agencies, including the DOJ, the SEC, and CFTC.  Additionally, numerous employees, including supervisors, traders, brokers, from the various financial institutions have been accused of improper conduct related to LIBOR.

67. On March 23, 2011, Bloomberg revealed that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.

68. The next day, the Financial Times reported that Defendant Barclays was "emerging as a key focus of the US and U.K. regulatory probe into alleged rigging of [LIBOR]." According to the Times, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank." The Times further stated

investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.[1]

69.    Additional information regarding the regulatory probes emerged during the next few months, including revelations about other banks' possible—or actual—misconduct.

70.    In an "Interim Management Statement" filed on April 27, 2011, for example, Barclays stated it was "cooperating with" the investigations by the U.K. Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

71.    RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

72.    Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests for information as part of the Libor investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."[2]

73.    Britain's Daily Telegraph further reported that Defendant HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds Banking Group, "was the main target given its near collapse in late 2008 as it lost access to wholesale funding markets."

74.    On May 23, 2011, the Telegraph reported that the Federal Bureau of Investigation ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

---

[1] Brooke Masters and Megan Murphy, "Barclays at centre of LIBOR inquiry," FT.com March 24 2011.

[2] Harry Wilson, "Lloyds Banking Group in LIBOR Investigation," *The Daily Telegraph*, May 17, 2011.

75.     In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo Interbank Offered Rate)." Accordingly, the company continued, it would "not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in connection with the matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation." The conditional leniency UBS received derives from the Antitrust Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ only grants leniency to corporations reporting actual illegal activity. UBS later disclosed (on February 7, 2012) that the Swiss Competition Commission had granted the bank conditional immunity regarding submissions for Yen LIBOR, TIBOR, and Swiss franc LIBOR.

76.     Similar to the other Defendants discussed above, HSBC, in an interim report filed on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from various regulators to provide information and were "cooperating with their enquiries."

77.     On or about the same day, Barclays—which several months earlier had referenced its "cooperation" with governmental entities investigating potential misconduct relating to LIBOR—specified the investigations involved "submissions made by Barclays" and other LIBOR panel members. Barclays further stated it was engaged in discussions with those authorities about potential resolution of these matters before proceedings are brought against the bank.

78.     On September 7, 2011, the Financial Times reported that as part of their LIBOR investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity Exchange Act, which can result in criminal liability—were examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction."[3]

79.     On October 19, 2011, The Wall Street Journal reported that the European Commission "seized documents from several major banks" the previous day, "marking the escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of euros' worth of euro-denominated loans and debt instruments. The Euribor inquiry, the Journal explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing for more than a year. According to the Journal, while the list of financial firms raided by the European Commission was not available, people familiar with the situation had counted "a large French bank and a large German bank" among the targets, and the coordinated raids "occurred in London and other European cities."

80.     On October 31, 2011, the Financial News observed that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."[4]

81.     On December 9, 2011, Law360 reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain

---

[3] Brooke Masters and Kara Scannell, "LIBOR inquiry looks at criminal angle," FT.com, September 7, 2011.

[4] Tom Osborn, "Is LIBOR in its death throes?" *Financial News,* October 31, 2011.

advantage on derivative trades." The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies. The Commission specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem."[5]

82.     Citigroup and UBS did not deny the SESC's findings. A Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation. The company has started working diligently to address the issues raised." A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved." She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue." Law360 reported that the SESC released "a similar statement" about UBS's alleged conduct.

83.     Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about the Euroyen Tokyo InterBank Offered Rate ("TIBOR"). The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from

---

[5] Juan Carlos Rodriquez, "Japan Accuses Citi, UBS of Market Trickery," *Law360*, December 9, 2011.

January 10 to January 23, 2012. On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the communications made by the CGMJ traders to employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank Japan's management team.

84.     UBS likewise recently revealed further details regarding the Japanese regulators' findings and the resulting disciplinary action. Specifically, the bank announced that on December 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd. ("UBS Securities Japan") based on findings by the SESC that:

> (i) a trader of UBS Securities Japan engaged in inappropriate conduct relating to Euroyen TIBOR and Yen LIBOR, including approaching UBS AG, Tokyo Branch, and other banks to ask them to submit TIBOR rates taking into account requests from the trader for the purpose of benefiting trading positions; and

> (ii) serious problems in the internal controls of UBS Securities Japan resulted in its failure to detect this conduct.

85.     Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR" from January 10 to January 16, 2012 (excluding transactions required to perform existing contracts). The JFSA also issued a "Business Improvement Order" requiring UBS Securities Japan to enhance "compliance with its legal and regulatory obligations" and to establish a "control framework" designed to prevent similar improper conduct.

86.     The Wall Street Journal has since cited people familiar with the UBS matter as identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded

products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS for about three years.[6]

87.     Other news accounts in recent months have confirmed—based at least in part on information from people familiar with the ongoing investigations—that investigators are examining potential improper collusion by traders and bankers to manipulate LIBOR or other rates. On February 3, 2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies, and collusive agreements to influence these rates.

88.     Additionally, on February 14, 2012, Bloomberg reported that two people with knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world." The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), stated investigators also had "received e-mail evidence of potential collusion" between firms setting LIBOR. Those sources further noted Britain's Financial Services Authority was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."[7]

---

[6] Jean Eaglesham, Atsuko Fukase & Sam Holmes, "Rate Probe Keys On Traders: Investigators Suspect Employees at Some Banks Tried to Manipulate Rates," *The Wall Street Journal,* February 7, 2012.

[7] Lindsay Fortado and Joshua Gallu, "LIBOR Probe Said to Expose Collusion, Lack of Internal Controls," *Bloomberg.* February 14, 2012.

89.    Bloomberg further reported that RBS had "dismissed at least four employees in connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

90.    Bloomberg also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

91.    In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.[8]

92.    Bloomberg interviewed money-market traders in March 2012, who said that staff responsible for panel banks' LIBOR submissions "regularly discussed where to set the measure with traders sitting near them, interdealer brokers, and counterparts at rival banks."[9]  "The talks became common practice after money markets froze in 2007. . . . Traders interviewed said there were no rules stopping talks between employees, or guidelines on how the rate should be set." The "BBA says only a bank's Treasurer or other nominated individual can make a submission, but a trader at one firm [told Bloomberg] that a large number of employees had access to the software used to make the bank's submissions and could overwrite other's figures." The Telegraph reported that "senior bankers privately admit it is easy for banks to fix Libor at rates that are favorable to their own interests, as the task of setting the rate is often undertaken by relatively junior employees."[10]

---

[8]  *Business Times,* March 9, 2012.

[9]  Liam Vaughan, Gavin Finch and Jesse Westbrook, "Life as LIBOR Traders Knew It Seen as Abusive," *Bloomberg,* March 15, 2011.

[10]  Jamie Dunkley and Harry Wilson, "UBS accused of manipulating LIBOR," *The Telegraph,* March 15, 2011.

93.     Defendants' manipulation of LIBOR allowed them to increase the interest charged to Debtors with adjustable rate notes, including the named Plaintiffs, on LIBOR-based financial instruments during the Class Period. Accordingly, the Plaintiffs seek relief for the damages they have suffered as a result of Defendants' violations of federal law.  Plaintiffs assert claims under the Sherman Act, 15 U.S.C. §§ 1, et seq., and the Clayton Act, 15 U.S.C. §§ 12, et seq.

## THE BARCLAYS CASE

94.     Barclays Bank PLC is a financial services corporation with headquarters located in London, England, U.K.  Barclays Bank PLC has banking subsidiaries around the world, including in the United States, and Barclays Bank PLC has a branch in New York.  Barclays Capital Inc. is a wholly-owned subsidiary of Barclays Bank PLC that engages in investment banking, wealth management and investment management services.  (Collectively "Barclays") Barclays employs derivative traders in New York and London who trade financial instruments tied to LIBOR and EURIBAR, including interest rate swaps and Eurodollar futures contracts ("swaps traders").    Barclays employees on its money market desk in London have been responsible for contributing Barclay's Dollar, Sterling, and Yen LIBOR submissions.

95.     After investigating, the U.S. Department of Justice ("DOJ") determined that Barclays's swaps traders either proposed a particular LIBOR or EURIBOR contribution for a particular tenor and currency, or proposed that the rate submitter contribute a rate that was **higher**, lower or unchanged for a particular tenor and currency.  Statement of Facts, ¶ 11 (emphasis supplied).

96.     The DOJ reported that "**at least as** early as June 2005 through approximately September 2007, in New York, New York and in London, England, several Barclays Dollar

swaps traders made **frequent** requests for favorable Dollar LIBOR contributions to Barclays Dollar LIBOR submitters on London money market desk.  From approximately September 2007 through approximately May 2009, such requests were made occasionally."  Statement of Facts, ¶ 12 (emphasis supplied).

97.     On or about June 27, 2012, Barclays announced that it had reached a settlement agreement  in relation to investigations with the Financial Services Authority, ("FSA"), the U.S. Commodity Futures Trading Commission ("CFTC"), and the United States Department of Justice Fraud Section ("DOJ").  Barclays agreed to pay total penalties of £ 290 million sterling in return for, *inter alia*, conditional leniency from the Antitrust Division of the DOJ.

98.     Barclays admitted that from June 2005 through September 2007, and periodically thereafter, its New York and London-based derivative traders made requests for favorable USD LIBOR contributions to the Barclays USD LIBOR submitters on the bank's London money markets desk, and that on numerous occasions, Barclays submitted USD LIBOR quotes to the BBA that reflected the traders' requests rather than the actual Barclays's interbank borrowing rates.

99.     The aforementioned manipulations were aimed at maximizing the traders' positions at specific points in time.  For instance, on February 22, 2006, at approximately 9:42 a.m., a Barclays's derivative trader sent an email to Barclays's USD LIBOR submitter on its money markets desk stating, "Hi (again) We're getting killed on our 3m resets, we need them to be up this week before we roll out our positions.  Consensus for 3m today is 4.78 – 4.7825, it would be amazing if we could go for 4.79...Really appreciate ur help mate."  The Barclays's submitter responded, "Happy to help."  Barclays's 3m USD LIBOR submission on February 22,

2006 was 4.79%.  Thus, an example where Barclays's traders manipulated LIBOR upwardly to maximize its profits.

100.    On yet another occasion, on April 2, 2007, a Barclays Euro Swaps Trader sent a messages saying, "hello, [Senior Euribor Submitter], could you please put in a high 6 month euribor today?" to which the Senior Euribor Submitter responded, "will do."[11]

101.    On information and belief, similar misconduct occurred at other banks during the Class Period.  Barclays alone could not move LIBOR without the cooperation and assistance of other submitters.  The aforementioned example illustrates the willingness of the Defendants to manipulate LIBOR upwardly as well as downwardly to increase their profits.

**POLICIES AND PRACTICES COMPLAINED OF**

102.    When Plaintiffs entered into loans and real estate mortgages with various lenders, including the Defendants and their subsidiaries, they also executed "Adjustable Rate Note[s]." Exhibit A attached hereto is an unexecuted exemplar of typical standard form LIBOR plus Adjustable Rate Note.

103.    The Adjustable Rate Notes all provide that the interest rate due and payable on said notes will adjust or change as of a "Change Date" specified in the note. Typically, the notes provide that after an initial period, Change Dates shall occur every six months.

104.    The Adjustable Rate Notes also provide a definition of "The Index" which will be used to calculate the new interest rate on each successive Change Date.

105.    All Class Members, including the Named Plaintiffs, have notes that specify that The Index shall be "the average of interbank offered rates for six-month U.S. Dollar

---

[11] Commodity Futures Trading Commission Order Instituting Proceedings, June 7, 2012, p. 15.

denominated deposits in the London market (LIBOR)....Most importantly, the Change Date for the application of the LIBOR rate is always set as the "first business day of the month."

106.    According to Thomson Financial, the top underwriters before September 2008 were Bear Stearns, Merrill Lynch, Wachovia, Citigroup, Deutsche Bank, and Bank of America Securities.

## CLASS ACTION ALLEGATIONS

107.    Each preceding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

108.    This action is properly brought as a Plaintiff Class Action under Fed. R. Civ. P. 23.  Plaintiffs will file a motion for class certification within the time set by the Court.  Plaintiffs anticipate requesting certification of a 23(a) and a (b)(2)-(b)(3) hybrid class but reserve the right to seek a different class should the facts and law support it.

109.    The "Debtor/Borrower Class" shall consists of all persons or other legal entities (excluding governmental entities, defendants, their officers, directors, subsidiaries, or affiliates), nationwide and within the territories of the United States who satisfy the following criteria:

        a.      Entered into an adjustable rate mortgage loan agreement with a lender; and

        b.      in which agreement the interest to be charged the class member was indexed to LIBOR ("LIBOR-Based Instrument"); and

        c.      which LIBOR-Based Instrument was bundled into a securitized pool and sold on the open market; and

d.      which security provided that the interest rate would adjust on a

"Change Date" on the first business day of a month; and

e.      which security was issued by or is or was owned in whole or part by

one of the Defendants; (applicable to the Antitrust class only) and

f.      the class period shall extend from January 1, 2000 to February

2009.[12]

110.    The class members of the Debtor Class are so numerous that individual joinder of

all members is impractical.  Plaintiffs aver that the class exceeds 10,000 borrowers nationwide.

111.    There are questions of law and fact common to the Plaintiffs the Class, which

questions predominate over any questions affecting only individual class members and, in fact,

the wrongs suffered and remedies sought by Plaintiffs and the other class members are identical,

the only difference being the exact monetary amount to which each class member is entitled, as a

matter of mere mathematical calculation.  The principal common issues for the Class are:

(a)     Whether the Defendants conspired to fix, set, increase, make artificial, and

manipulate LIBOR;

(b)     Whether the Defendants' conduct had an anticompetitive and manipulative

effect on LIBOR during the Class Period;

(c)     Whether the Defendants' conduct violated the Sherman Act.

(d)     Whether Defendants' conduct violated the state statutes raised in the

Complaint;

(e)     Whether the Defendants' conduct caused the Plaintiffs' interest rates to

increase;

---

[12]Plaintiffs will file a motion for class certification as soon as practicable which will provide for subclasses, if necessary, for the claims filed.

(f)     Whether Defendants' conduct increased the rates of return of the LIBOR-Based Debt Instruments owned or serviced directly by the Defendants during the Class Period;

(g)     Whether the Defendants took steps to conceal the contract, combination or conspiracy;

(h)     Whether the Plaintiffs and the Class members are entitled to equitable and injunctive relief and the nature of such relief; and

(i)     The appropriate measure of damages for the injury sustained by the Plaintiffs and other Class Members as a result of Defendants's unlawful activities.

112.    The common questions noted above are susceptible to class-wide proof.  Whether Defendants conspired to manipulate LIBOR rates in order to maximize the rate of return for themselves and their investors will affect the determination of every Class Members' claim.

113.    The Named Plaintiffs' claims are typical of those of the members of the Class and are based on the same legal and factual theories.  Each named Plaintiff's claim arises from the same interest, event, pattern and practice and is based upon the same legal theory.  Most, if not all adjustable rate residential loan transactions contained a standard provision defining "The 'Index' [as] the average of interbank offered rates for six-month U.S. Dollar-denominated deposits in the London market "LIBOR"), as published in the *Wall Street Journal*." "The Index," thus quoted, is identical in all substantive and pertinent regards, for all the named Plaintiffs and for each class member.  If named Plaintiffs prove their individual claims, then each Plaintiff and

each class member will have been subjected to the imposition of a increased and manipulated interest rates.

114.    The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have suffered economic injury in their own capacity from the practices complained of and understand the nature of their duty as representatives of the Class, the nature and extent of their claims against Defendant, and the relief available to them and the class members.  Neither Plaintiffs nor their counsel have any conflicting interests, which might cause them not to vigorously pursue this action.

115.    Plaintiffs have retained counsel with experience in federal court and complex litigation, class actions and actions involving predatory lending and unlawful lending practices. Accordingly, the undersigned counsel will provide adequate representation of the Plaintiffs and the classes.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all class members is impracticable.  The damages suffered by the individual class members are relatively small, given the expense and complexity  of the claims asserted in the litigation.  Thus, absent the availability of class action procedures, it would not be feasible for class members to redress the wrongs done them.  Even if the class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

117.    Certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(2) is appropriate because the Defendant has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

118.    Certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(3) is also appropriate as to Defendant, in that questions common to the Class predominate over questions pertaining to individual class members, and a Plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A Plaintiff class action will cause an orderly and expeditious administration of class members' claims and economies of time, effort and expense will be fostered and uniformity of decisions will be ensured.  Moreover, the individual class members are certain to be unaware of and ignorant of their rights and not in a position (either through experience or financially) to commence individual litigation against Defendant.  Expecting the class members to bring claims individually is unrealistic and unfeasible.  The only practical means of rectifying these problems and providing wide spread relief is through the class action procedure.

119.    Plaintiffs also seek injunctive relief to order Defendant in the future to cease the price fixing and unlawful manipulation of LIBOR and other relief.  Such relief is appropriate on a class-wide basis under Fed. R. Civ. P. 23(b)(2).

### STATUTE OF LIMITATIONS
### AND
### EQUITABLE TOLLING

120.     Section 4 of the Clayton Act provides a limitation period of 4 years. However, the unlawful acts in restraint of trade have been a continuing enterprise and the statute of limitations has been tolled.

121.     The Defendants conspired to share their interest rate information and falsely report interest rate information to the BBA and Reuters. Their purpose was to manipulate USD-LIBOR to artificially high and low levels and thereby maximize their profits.

122.     By its very nature, the Defendants' alleged misconduct was self-concealing.  First, the Defendants' actual or realistic interest rates were not public information, making any comparison to the rates they published to the BBA, and in turn Reuters, and any discernment of discrepancies an impossibility. Second, the Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the specific misconduct of individual Defendants' or the conspiracy. Third, the Defendants' trades on the exchanges or in the markets for LIBOR products were not public information, making it impossible to discern that they were using their false LIBOR reports to cause artificial prices and engage in manipulative trading.

123.     As a result of the self-concealing nature of the Defendants' collusive scheme, no person of ordinary intelligence would previously have discovered their conspiracy to manipulate LIBOR or the manipulative trades to the detriment of Plaintiffs and the Class.

124.     The Defendants are also estopped to challenge Plaintiffs' and Class Members' reliance upon equitable tolling and estoppel to toll the statutes of limitation. Indeed, having knowingly and intentionally concocted and concealed their Antitrust, and fraudulent schemes,

the Defendants are estopped by their unclean hands to rely upon statutes of limitations that, if sustained, would reward them for their successful and continuing concealment.

### Antitrust Allegations

125.    During the Class Period, as explained above, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, increase and stabilize six (6) month USD LIBOR at or around the first business day of each month and thus maximize their profits and rates of return on LIBOR-Based Instruments owned, sold and traded by them.   A review of Six (6) Month USD LIBOR rates for the years 2000 and 2001 exposes an otherwise inexplicable increase in the rate on, or about, the first business day of each month.

126.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, increase and otherwise make artificial the price of six (6) month USD LIBOR-Based Derivatives.  These activities included the following:

(a) Defendants participated in meetings and/or conversations to unlawfully

discuss their reporting of their borrowing rates to Thomson Reuters for calculation of the

daily LIBOR;

(b) Defendants agreed during those meetings and conversations to unlawfully report their

borrowing rates to Reuters for calculation of six (6) month USD LIBOR in order to drive

the LIBOR rate upwardly at or around the first business day of the month during the

Class Period;

(c) Defendants signaled to one another their intention to increase or otherwise make artificial six (6) month USD LIBOR and colluded with one another in achieving this unlawful anticompetitive purpose; and

(d) Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to increase or otherwise make artificial the price of LIBOR-Based Instruments.

## ALLEGATIONS OF INJURY TO THE PLAINTIFFS AND THE CLASS

127.    Defendants' anticompetitive conduct had severe adverse consequences on the Plaintiffs by increasing the interest rate charged on their LIBOR-based loans and causing them to suffer financial losses, and loss of equity in their residences and were, therefore, injured in their business or property.

### COUNT 1
### Violations of Antitrust Laws
### Section 1 of the Sherman Act

128.    The Plaintiffs incorporate by reference the preceding allegations.

129.    Beginning at least as early as January 1, 2000, and continuing at least until February 2009, the exact dates being currently unknown to Plaintiffs, Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

130.    During the Class Period, Defendants controlled what LIBOR quote would be reported and therefore controlled the index which would set the interest rates on Plaintiffs mortgages and notes.  The Defendants, thus, attempted to manipulate the mortgage rates, in order

to increase the rates of return on LIBOR-Based CDOs sold by them, including, the CDOs for which the Plaintiffs' mortgages stood as security.

131.   The conspiracy consisted of a continuing agreement, understanding or concerted action, on or about the first business day of each month, between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, increased, stabilized or made artificial, the Six (6) Month LIBOR and thus manipulated the prices and rates of return on LIBOR-Based CDOs (for which the Plaintiffs' mortgages stood as security) sold by them. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

132.   Defendants' conspiracy, and resulting impact on the market for LIBOR-Based CDOs, and the Plaintiffs' LIBOR-Based loans occurred in or affected interstate and foreign commerce.

133.   As a proximate result of Defendants' unlawful conduct, the Plaintiffs and members of the Class have suffered injury to their property.

134.   Plaintiffs and the class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions they created in the furtherance of their conspiracy.

## COUNT II
## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)
## 18 U.S.C. §§ 1961 *et. seq.*

135.   The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

### **Defendants Engaged In Conduct Actionable Under RICO.**

136.   18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

137.   18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

138.   Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to financial institution fraud).

139.   18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

140.   18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

141.   18 U.S.C. § 1341, the mail fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

142.    18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

143.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by communicating false LIBOR quotes to the

BBA or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

144.    At all relevant times, the Plaintiffs and the Class Members were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

### Defendants Formed A RICO Enterprise

145.    Defendants' collective association, including through their participation together as members of the BBA's USD-LIBOR panel, constitutes the RICO enterprise in this case.

146.    Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA.  Using those false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues by charging and collecting artificially high interest payments from Plaintiffs and the Class, constitutes the common purpose of the enterprise.

### The Enterprise Has Perpetrated A Continuing Practice Of Racketeering

147.    For at least ten years before this Complaint was filed, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR, on or about the first business day of each month, to be higher than it otherwise would have been. Defendants did so for the purpose and with the effect of increasing the interest rates on Plaintiffs' mortgages and thereby increasing the value of the LIBOR-Based CDOs sold, traded and owned by them and, thus, increasing their net interest revenues.  Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits as a result, which they shared with the employees who perpetrated the scheme.  The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

148.    In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate LIBOR.  Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

149.    For at least the past four years, Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing, to manipulate LIBOR, which allowed Defendants to reap unlawful profits.

150.    Defendants have committed the predicate act of mail fraud under 18 U.S.C. § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a scheme or artifice to defraud" both the Plaintiff-borrowers and purchasers and holders of LIBOR-based financial instruments, and "for the purpose of executing such scheme or artifice or attempting so to do," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from those entities such documents or packages, including:  (i) documents denominated as "mortgage statements" and (ii) correspondence informing Plaintiffs of changes in LIBOR-based interest rates and monthly payments (the conduct described in this paragraph is referred to as the "Mail Fraud").

151.    On information and belief, the Mail Fraud is the result of Defendants "having devised or intended to devise a scheme or artifice to defraud" Plaintiff-borrowers, for the purpose of obtaining money from them through "false or fraudulent pretenses, representations, or promises."

152.    By devising the scheme or artifice to defraud Plaintiffs as described herein, and for obtaining money from Plaintiffs through "false or fraudulent pretenses, representations, or promises" about their true borrowing costs, Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, . . . writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by:

(a)    transmitting phony statements about their costs of borrowing;

(b)    transmitting e-mail communications relating to the process of determining, making, or transmitting phony statements about their borrowing costs;

(c)    transmitting instructions to mortgage servicers to raise Plaintiffs' interest rates in response to the artificially set LIBOR rates;

(d)    collecting funds from the Plaintiffs *via* electronic fund transfers or electronic communication with their banks or credit card institutions;

(e)    transmitting loan balance and other credit information to credit reporting agencies; and

(f)    transmitting debt information *via* email to U.S. Courts in collection and bankruptcy actions.

153.   In addition to that conduct, the Plaintiffs are informed and believe Defendants used the mails and wires in conjunction with reaching their agreement to make false statements about their costs of borrowing, to manipulate LIBOR.

### The Racketeering Scheme Affected Interstate Commerce

154.   Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of Plaintiffs, who resided in different states.

155.   The Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the Internet or the mails across state lines as well as agreements between entities in different states to manipulate LIBOR.  Using those interstate channels to coordinate the scheme and transmit (or cause to be transmitted) fraudulent mortgage statements to the Plaintiffs and the Class members across state lines satisfies RICO's requirement of an effect on interstate commerce.

### Defendants Conspired To Violate RICO

156.   Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

157.   The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

158.   Defendants organized and implemented the scheme, and ensured it continued uninterrupted by concealing their manipulation of LIBOR from the public, including the Plaintiffs.

159.    Defendants knew the scheme would defraud the Plaintiffs' of millions of dollars of interest, yet each Defendant remained a participant despite the fraudulent nature of the enterprise.  At any point while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the direct detriment of mortgagors with LIBOR-based mortgages and notes.

### The Plaintiffs Suffered Injury Resulting From
### The Pattern of Racketeering Activity

160.    Because the the Plaintiffs unknowingly paid money to Defendants on LIBOR-based mortgages at artificial and manipulated rates, and in fact paid or were charged more interest than they would have absent the conspiracy, the Plaintiffs are direct victims of Defendants' wrongful and unlawful conduct.  The Plaintiffs' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted and the loss of money satisfies RICO's injury requirement.  Additionally, the artificially inflated interest rates increased the amounts owed to Plaintiffs' lenders thereby robbing them of equity in there property.

161.    The pattern of racketeering activity, as described in this Complaint, is continuous, ongoing and will continue unless Defendants are enjoined from continuing their racketeering practices.  Defendants have consistently demonstrated their unwillingness to discontinue the illegal practices described herein, and they continue their pattern of racketeering as of the filing of this Complaint.

162.     The Plaintiffs and the Class members are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

163.     As a direct and proximate result of the subject racketeering activities, the Plaintiffs and the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## COUNT III
**Violations of the New York Antitrust Statute**
**N.Y. Gen. Bus. Law § 340**
**"The Donnelly Act"**

164.     The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

165.     The Defendants secretly agreed to raise the Six (6) Month USD-LIBOR, on or about the first day of each month, for the purpose and effect of raising the interest rate on the the Plaintiffs' and the Class Members' LIBOR-based promissory notes and mortgages.  The Plaintiffs and the Class Members were targets of the Defendants' conspiracy.

166.     Defendants' conduct was intentional, malicious, flagrant, and intended to effectuate its natural result with reckless disregard to the Plaintiffs' and Class Members' rights.

167.     While it had wide-spreading consequences and touched persons in every state and territory, the conspiracy was conceived, formulated and carried out in the state of New York.

168.     The Defendants have violated the laws of New York, N.Y. Gen. Bus. § 340 ("the Donnelly Act").

169.    By reason of the Defendants' conspiracy in restraint of trade and commerce, Plaintiffs and each Class Member paid more in interest on his and her LIBOR-based mortgages and promissory notes than he or she would have paid absent such conduct.  Additionally, each Class Members' equity in his or her residence has been decreased as a direct consequence of the Defendants' conspiratorial acts.

## COUNT IV
### Unjust Enrichment and Restitution

170.    The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

171.    It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of the Plaintiffs and members of the Class.

172.    The Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## COUNT V
### Declaratory and Injunctive Relief

173.    The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

174.    The imposition of artificially high interest rates described above will cause irreparable harm and injury to Plaintiffs and the Class in the future.  Under the terms of the mortgage, the inflated interest rate charges will become a first lien on each class member's home and interest will accrue on the illegal charges.

175.    Plaintiffs, on behalf of themselves and all Class Members, seek a judgment declaring that the Defendants' practice of conspiring to raise interest rates on their adjustable rate mortgages above the rate that would have otherwise been fixed violates the law.

176.    Plaintiffs, on behalf of themselves and all Class Members, seek an injunction ordering the Defendants to cease the practices complained of herein and to disgorge the inflated interest rate charges and make restitution, with interest and damages, to the Class.

177.    Plaintiffs and Class Members do not have a plain, adequate, speedy or complete remedy at law to address the wrongs alleged in this complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless declaratory and injunctive relief is granted.

178.    By reason of the foregoing, Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

## COUNT VI
### Breach of Contract

179.    The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

180.    At a time prior to the closing of their respective loans, Plaintiffs and Defendant had entered into a contract for a mortgage loan.

181.    The agreement included a provision for the imposition by the Defendant of interest at LIBOR plus.

182.    Every contract includes the implied covenant of good faith and fair dealing, the covenant holds that neither party will act in such a way as to impede the others right to receive the benefits under the agreement.

183.    The law enters into and defines the obligation of every contract.

184.    Every contract is made with reference to existing law and every law affecting the contract is read into and becomes a part of the contract when made.

185.    Defendant has charged and the Plaintiffs have paid interest in excess of the rate lawful under the laws of their charter.

186.    Defendant breached the contract by charging Plaintiffs interest in excess of that permitted under the contract and the law.

187.    Plaintiffs have been damaged by the breach of contract by being required to pay excessive interest and interest on those charges that have and will accrue on said additional indebtedness throughout the course of their loans.

<div align="center">

**COUNT VII**
**Tortuous Interference with Business Relationship**

</div>

188.    The Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

189.    Plaintiffs entered into loan agreements that included provisions that the interest be tied to LIBOR.

190.    Defendant, as a participant in the market, was aware that the interest rates paid by Plaintiffs were tied to LIBOR.

191.    Defendants intentionally manipulated the LIBOR rates, in order to change the cost of Plaintiffs' loans.

192.    Plaintiffs have been proximately harmed by the manipulation of the LIBOR rates by Defendant by being required to pay excessive interest and interest on those charges that have and will accrue on said additional indebtedness throughout the course of their loans.  The harm caused to Plaintiffs was foreseeable and intentionally caused by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, as follows:

(a) For an Order appointing the undersigned counsel to act as interim Class Counsel pursuant to Fed. R. Civ. P. 23(g)(3) to act on behalf of the putative class before the determination of whether to certify the class under Fed. R. Civ. P. 23 is made;

(b) For an Order certifying that this action may be maintained as a Plaintiff class action, as defined above, under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3);

(c) For an Order appointing the Plaintiffs to act as representatives of the class members and the class;

(d) For an Order appointing the undersigned counsel as Class Counsel;

(e) For an Order directing that reasonable notice of this class action be given to all members of the class at the appropriate time after discovery and dispositive motions have been resolved;

(f) that the Court convene a jury trial;

(g) For an Order awarding Plaintiffs and the Class Members punitive, exemplary, statutory, and full consideration damages, as appropriate, under state law;

(h) For a permanent injunction enjoining Defendant, together with its officers, directors, employees, agents, partners or representatives, successors, affiliates and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the class members; and

(i)  For an order directing disgorgement or restitution against Defendant as to each Plaintiff and Class Member and the imposition of an equitable constructive trust over such amounts for the benefit of the class members;

(j)  For reasonable attorneys' fees as provided by law and statute;

(k)  For pre-and-post judgment interest as provided by law in amount according to proof at trial;

(l)  For an award of costs and expenses incurred in this action; and

(m) For such other and further relief as the Court may deem necessary and proper under these premises.

For such other and further relief as the Court may deem necessary and proper.

PLAINTIFFS REQUEST TRIAL BY JURY.

<div style="margin-left:40%">

Respectfully submitted,

Counsel for Plaintiffs

/s/ *Stephen G. Stim*
STEPHEN G. STIM
5A Frost Mill Road
Mill Neck, NY  11765
(516) 477-2550
stimconsul@aol.com

</div>

OF COUNSEL:

John W. Sharbrough, III (To be admitted PHV)
John W. Sharbrough, III, P.C.
114 Eaton Square
Mobile, AL  36608-1936
Tel:    (251) 432-1413
Direct: (251) 432-1441
Fax:    (251) 432-5297
john@sharbroughlaw.com

John R. Cox (To be admitted PHV)
John R. Cox, PLLC
P.O. Box 3075
Daphne, AL 36526
Tel:     (251) 517-4753
Fax:     (888)640-0720
jrc@jrcoxlaw.com

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

October 23, 2002                              Orange                              CA
[Date]                                        [City]                              [State]

2230 HOPPIN STREET, MOBILE, AL  36605
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$ 66,000.00**  (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender  is  Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of **11.525 %**.  This interest rate I will pay may change in accordance with Section 4 of this Note.  The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on    **December 1, 2002** .   I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  My monthly payments will be applied to interest before principal.  If, on **November 1, 2032**    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my payments at:    **505 City Parkway West, Suite 100 Orange, CA 92868**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$ 654.86** .  This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of  **November, 2004** , and on that day every sixth month thereafter.  Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and one-half** percentage point(s) (**6.500 %**) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.  The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

Initials:_____

10/23/2002 3:26:46 PM

|Loan Number:

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.525 % or less than 11.525 %**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **one** percentage point(s) **(1.000 %)** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater **17.525**% or less than **11.525%** .

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(5)  PREPAYMENT PRIVILEGE**

I may prepay the principal balance of this loan at anytime, in full or in part, without the imposition of a prepayment penalty by the lender.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D)  No Waiver by Note Holder**

Even if, at a time which I am in default, the Note Holder does not require me to pay immediately in full as described|above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Initials:_____

Loan Number:

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. GOVERNING LAW PROVISION**

This Note and the related Security interest are governed by the Alternative Mortgage Transaction Parity Act of 1982, 12 USC §3802 et. seq., and, to the extend not inconsistent therewith, Federal and State law applicable to the jurisdiction of the Property.

**Oral agreements, promises or commitments to lend money, extend credit, or forebear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)   _____ (Seal)
BORROWER  ANNIE B. C. ADAMS                BORROWER

_____ (Seal)   _____ (Seal)
BORROWER                                  BORROWER